Defendant-Appellant Eric Marcus appeals from the magistrate's decision and the trial court's subsequent adoption of that decision over his objections stemming from Plaintiff-Appellee Ildiko Marcus' post-divorce decree motion. The motion contained three branches: (a) a request to modify child support, (b) a motion to modify spousal support, and (c) a motion to show cause for failure of Mr. Marcus to provide Ms. Marcus with 100 free pizzas per year as contained in the divorce decree.
Ms. Marcus and Mr. Marcus were married on December 19, 1974. Two children were born as issue of the marriage, Andrea Marcus, born November 7, 1980, and Lauren Marcus, born May 7, 1984. Ms. Marcus filed her complaint for divorce in the Greene County domestic relations court on September 3, 1991. To assist the trial court in its determination of the parties' incomes and financial status, Ronald C. Russell, C.P.A., was appointed as the court's independent expert.
The final judgment and decree of divorce was filed on September 3, 1993. In the decree, Ms. Marcus was designated as Lauren's residential parent, and Mr. Marcus was designated as Andrea's residential parent. At that time, neither party was obligated to pay child support. The decree stated that Mr. Marcus was to remain the custodian of the minor children's accounts, to be used for the benefit of the children. Additionally, the decree awarded Mr. Marcus retention of all interest, free from any claims by Ms. Marcus, of Western Ohio Pizza, Inc. ("WOP"), Northcutt Pizza, Inc., Fairborn Pizza, Inc., and Xenia Pizza, Inc. In return, Mr. Marcus was ordered to pay a lump sum property settlement of $800,000 to Ms. Marcus, payable with a 4% per annum interest, with annual payments equal to 17% of the total after-tax earnings of WOP based on the year-end financial statement. Mr. Marcus was ordered to pay the total property settlement within 15 years of the filing of the decree. Additionally, the decree provided that beginning in 1993, until the property settlement had been paid in full, Mr. Marcus' annual wages from WOP could not exceed $130,000, plus an allowance for a cost of living as set forth on the Consumer Price Index. The parties had also agreed that no bonuses would be taken by Mr. Marcus from WOP to lower the after- tax earnings of WOP for purposes of the 17% calculation.
On January 3, 1996, Ms. Marcus filed a three branch motion alleging that a change in circumstances had occurred since the divorce that would justify a modification of spousal support and an award of child support from Mr. Marcus to Ms. Marcus, and that Mr. Marcus should be found in contempt for failure to comply with the decree's requirement that he provide to Ms. Marcus 100 free pizzas per year until the property settlement has been paid in full. Russell was again appointed as the court's expert to determine the parties' financial status and income. A hearing was held on the motion on November 17 and 18, 1997. At that hearing, Russell valuated the parties' incomes for support purposes based on his analysis of their tax returns and financial statements. Russell calculated Ms. Marcus' income for 1996 to be $156,864. In 1996, Mr. Marcus had bought out the remaining 50% shareholder of WOP, thus he became the sole shareholder of WOP, a subchapter S corporation. Despite Mr. Marcus' 1996 tax return, which indicated that WOP had a negative cash flow of $29,056, Russell calculated Mr. Marcus' income at $690,566. Russell testified that he disallowed the depreciation expenses which Mr. Marcus had taken on his federal income taxes. Russell utilized the debt repayment method in determining the amount of cash flow Mr. Marcus had available to him. Thus, Russell concluded that Mr. Marcus' income from WOP in 1996 was his net income of $128,240 plus $575,463 added back for depreciation, less $270,000 for debt repayment. Russell similarly calculated Mr. Marcus' income from Mr. Marcus' other business ventures. Russell also imputed an additional amount of $8,000 to Mr. Marcus' income for "corporate benefits." Russell explained that he based this amount not on Mr. Marcus' tax returns, but on Russell's experience in dealing with closely-held corporations.
Alan C. Duvall, C.P.A., J.D., testified on behalf of Mr. Marcus. Duvall had been associated with WOP since 1980, and with Mr. Marcus for a large portion of that time. Duvall stated that depreciation is a real expense, and therefore should be allowed as an expense in calculating income for child support purposes. Duvall also argued that if depreciation was to be added back into Mr. Marcus' income, all of Mr. Marcus' cash expenditures in the business ventures should be deducted from his income in determining cash flow. Using this theory, Mr. Marcus had zero cash flow available to him from WOP in 1996 and the preceding three years.
Duvall explained that under the franchisor agreement, Mr. Marcus was required to spend $50,000 per store for his 50 Domino's stores over the next five years. However, during cross-examination, Duvall stated that Domino's had set compliance at a minimum level of $22,700 per store.
Duvall testified that in preparing Mr. Marcus' tax returns, he had also taken into account Mr. Marcus' "corporate benefits" which included Bengals tickets, Victoria Theater seats, a company car, Indianapolis 500 seats, and a rally car. Additionally, the Internal Revenue Service ("IRS") had notice of these corporate benefits from a lifestyle audit of Mr. Marcus in 1993- 1994. At that time, the IRS did not find Mr. Marcus liable for any additional taxes.
Both Ms. and Mr. Marcus testified on their own behalf. Ms. Marcus stated that she worked approximately 20 hours per week at Greene Memorial Hospital as an outpatient nurse for $15.48 per hour. She had not worked full time because her department did not need the additional help, and also because she wanted to be at home for Lauren. Ms. Marcus had liquid assets amounting to $655,373, with a note receivable from Mr. Marcus from the property settlement for $800,000 plus $30,000 in interest.
Ms. Marcus testified that she did not have much information regarding Lauren's custodial account, as she had no access to the account. To the best of her knowledge, the custodial account had been generating approximately $25,000 in interest per year, but neither she nor Lauren ever received this money. As far as she knew, Mr. Marcus had paid the taxes on the account with the money from the interest and reinvested the rest in the account.
Mr. Marcus stated that National City Bank had frozen his income from WOP at $135,000 per year pursuant to the agreement in the divorce decree, although in 1994 and 1995 he admitted to taking additional money as a year -end bonus to pay the income taxes due on his percentage of his corporation. He also stated that he "might" have used 30% of this money for personal expenses in 1995. Additionally, Mr. Marcus stated that between the date of the hearing and the year 2001, he was planning to spend between $40,000- 60,000 per store for remodeling under the franchise agreement.
Mr. Marcus testified that he had satisfied the terms of the property settlement because he had been paying Ms. Marcus the required 17% of WOP's after-tax income, although WOP had no after-tax income for the past four years.
Finally, Charles Maples, the controller-treasurer for WOP, testified that he had been preparing yearly fixed asset schedules for each store. Maples stated that from 1996 through October 1997, WOP had planned to spend a total of $504,062 on fixed assets, "ordinary" purchases in the industry, which were necessary for the production of income and future growth. Maples did not give specifics as to what these purchases were, other than equipment, leaseholds, software purchases, and automobiles.
On December 5, 1997, the magistrate filed his decision and order, finding that no change of circumstances had occurred under the terms of the divorce decree to justify an increase in spousal support. The magistrate also determined that Mr. Marcus had complied with the requirements of providing free pizzas to Ms. Marcus. The motion to modify child support was sustained based on Mr. Marcus' substantial increase in income, and it was determined that Ms. Marcus was entitled to receive child support in the amount of $3,226 plus poundage per month. Mr. Marcus objected to the Magistrate's decision regarding child support, but the trial court overruled his objections on July 24, 1998. Mr. Marcus now timely appeals the trial court's decision.
For ease of organization, we will address Mr. Marcus' First, Second and Fourth Assignments of Error together.
 I. The trial court abused its discretion when it added back claimed depreciation expenses to appellant's self-generated income in calculating appellant's income for child support purposes.
 II. The trial court abused its discretion when it failed to deduct appellant's actual cash expenditures for Western Ohio Pizza, Inc. from appellant's self-generated income in calculating appellant's income for child support purposes.
 IV. The trial court abused its discretion when it added the depreciation expenses of appellant's interest in Xenia Pizza and Fairborn Pizza to appellant's income and failed to deduct the actual cash expenditures for fixed asset purchases for Fairborn Pizza from appellant's income in calculating appellant's income for child support purposes.
For child support purposes, the trial court determined that Mr. Marcus' total annual gross income was $549,458. This figure represented his income of $300,879 from WOP, which included a net income of $128,240, plus depreciation added back of $172,639. This amount of depreciation represented 30% of the total depreciation claimed by Mr. Marcus. The income figure also accounted for Mr. Marcus' income of $16,221 from his one-quarter interest in Xenia Pizza, including depreciation added back of $316, and his income for Fairborn Pizza of $77,379, including depreciation added back of $3,548. Also included in this calculation was interest and dividend income from real estate rents.
In these assignments of error, Mr. Marcus argues that the trial court abused its discretion by adding back 30% of WOP, Xenia Pizza, and Fairborn Pizza's depreciation expenses to his income. Mr. Marcus also claims that it was an abuse of discretion for the trial court to not provide a deduction for WOP and Fairborn Pizza's actual cash expenditures.
An appellate court is to apply an abuse of discretion standard when reviewing a domestic relations court's decision regarding issues of child support. Booth v. Booth (1989),44 Ohio St.3d 142, 144. The lower court is said to have abused its discretion only when its decision is unreasonable, arbitrary or unconscionable. Id. In fact, when applying the abuse of discretion standard, the appellate court is guided by the presumption that the findings of the domestic relations court are correct. In re Jane Doe 1 (1991), 57 Ohio St.3d 135, 138.
In this case, Mr. Marcus bought out the other 50% partner of WOP in 1996, and thus became the sole shareholder in the subchapter S corporation. As such, WOP's total earnings are attributable to and available to Mr. Marcus. I.R.C. § 1366(a)(b)(c). As explained in Harter v. Harter (Feb. 26, 1998), Allen App. No. 1-97-55, unreported, a subchapter S corporation does not pay its own federal income tax:
 [r]ather, for federal tax purposes it is treated as a proprietorship or partnership and its annual earnings, whether distributed or not, are treated for tax purposes as if they are the personal earnings proportionately of the individual shareholders. The shareholders, therefore, pay federal income taxes on corporate earnings, rather than dividends, together with any other individual taxable income they may have. [If a party] is the sole shareholder, all corporate earnings or losses and applicable federal tax deductions, are treated for tax purposes as his personally, regardless of whether or not he has withdrawn the money represented by the corporate earnings.
R.C. § 3113.215(A), which defines income for purposes of child support calculations, states in pertinent part:
(1) "Income" means either of the following:
 (a) For a parent who is employed to full capacity, the gross income of the parent;
 (2) "Gross income" means, * * *, the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes, but is not limited to income from salaries, wages, * * *, and all other sources of income; * * * self-generated income; and potential cash flow from any source.
 (3) "Self-generated income" means gross receipts received by a parent from self-employment, proprietorship of a business, joint ownership of a partnership or closely held corporation, and rents minus ordinary and necessary expenses incurred by the parent in generating the gross receipts. "Self-generated income" includes expense reimbursements or in-kind payments received by a parent from self-employment, the operation of a business, or rents, including, but not limited to, company cars, free housing, reimbursed meals, and other benefits, if the reimbursements are significant and reduce personal living expenses.
As stated by the court in Helfrich v. Helfrich (Sept. 17, 1996), Franklin App. No. 95APF12-1599, unreported, the theory behind income for child support purposes is different from income for tax purposes:
 The legislature has specifically provided a definition of ordinary and necessary expenses to be applied when determining the amount of income available for child support. Further, the purposes underlying the Internal Revenue Code and the child support guidelines are vastly different. The tax code permits or denies deduction from gross income based on myriad economic and social policy concerns which have no bearing on child support. The child support guidelines in contrast are concerned solely with determining how much money is actually available for child support purposes. To this end, R.C. 3113.215(A)(2) includes nontaxable income in "gross income" for purposes of calculating child support. This recognized the economic reality that all money earned by a parent, irrespective of its taxability, is in fact income to that parent.
The tax concept of cash expenditures and depreciation are dealt with differently for child support purposes, as stated in R.C. § 3113.215(A)(4):
 (a) "Ordinary and necessary expenses incurred in generating gross receipts" means actual cash items expended by the parent or the parent's business and includes depreciation expenses of replacement business equipment as shown on the books of a business entity.
 (b) Except as specifically included in "ordinary and necessary expenses incurred in generating gross receipts" by division (A)(4)(a) of this section, "ordinary and necessary expenses incurred in generating gross receipts" does not include depreciation expenses and other noncash items that are allowed as deductions on any federal tax return of the parent or the parent's business.
This exclusion of "depreciation expenses and other noncash items" from ordinary and necessary business expenses for child support purposes "is designed to ensure that a parent's gross income is not reduced by any sum that was not actually expended in the year used for computing child support." Emary v. Emary (Oct. 23, 1996), Lorain App. No. 96CA006353, unreported, quoting Baus v. Baus (1991),72 Ohio App.3d 781, 784. The reason for this is that depreciation expenses for federal income tax purposes are not "actual cash outlays" of that corporation for the tax year. Harter, supra.
It is important to note that in his argument, Mr. Marcus relies heavily on this court's decision in Sizemore v. Sizemore (Oct. 16, 1991), Montgomery App. No. 12730, unreported, where we held that in determining income for child support purposes, "prejudicial error" could result from the court adding back depreciation to the personal income of a corporate proprietor. We found error in the trial court's adding back of depreciation in the amount of $29,711.00 to increase the appellant's income to $50,738.00. Id. This decision was based in part on the language of R.C. § 3113.215(A)(4) at that time, which did not authorize a depreciation add back to the personal income of the parent-owner for child support purposes. Id. However, in 1993 the legislature amended R.C. § 3113.215(A)(4) to allow for the deduction of depreciation under R.C. § 3113.215(A)(4)(a) for ordinary and necessary replacement business equipment, and under R.C. § 3113.215(A)(4)(b), allows for the add back of depreciation for all other ordinary and necessary expenses.
Furthermore, the deduction permitted under R.C. § 3113.215(A)(4)(a) for actual cash items expended in generating gross receipts "recognizes the economic reality that money legitimately expended by a self-employed parent to make more money is, in fact, not available for child support purposes."Helfrich, supra. Thus, pursuant to this section, a deduction is allowed for cash expenditures made by a parent or a parent's business for purchasing replacement business equipment. This deduction from the parent's gross income is to be made over a period of years "according to the depreciation schedules of the Internal Revenue Code." Helfrich,supra. All other capital expenditures are to be deducted in their entirety for the year in which purchased. Id.
Despite the allowance of a deduction under R.C. § 3113.215(A)(4)(a) for actual cash expended in generating gross receipts, the trial court may, within its discretion, deviate from the child support guidelines pursuant to R.C. § 3113.215(B)(2)(c) and (B)(3). The court may determine that the parent has made "excessive capital expenditures" and that a deviation is in the best interest of the child. Helfrich, supra. See, also, Kamm v. Kamm (1993), 67 Ohio St.3d 174, 177.
In this case, Russell analyzed both parties' tax returns and financial statements from 1996, and valuated the parties' incomes for child support purposes. Russell explained that 100% of the depreciation could not be added back into Mr. Marcus' income without allowing for a deduction of actual cash expenditures on debt repayment for that year. However, in reaching these conclusions, Russell did not determine what items were being depreciated and whether or not they were replacement equipment, because this information was not provided in the financial statements or tax returns. Similarly, Russell could not discern whether the fixed asset purchases, in particular those relating to Mr. Marcus' "modernization" plan, were ordinary and necessary, and what portion of them were paid for in cash.
Duvall and Mr. Marcus argued for a different theory to compute Mr. Marcus' income. They asserted that if all of the depreciation was to be added back, it was necessary to give a deduction for actual cash expenditures. They, too, did not provide the court with evidence of what these expenditures were, if these expenditures were ordinary and necessary, and which assets were paid for in cash and which by credit. Duvall and Mr. Marcus testified generally about the fixed assets and the cash purchases, but no specifics were provided to enable the court to determine if these were valid deductions. Furthermore, the evidentiary materials submitted as trial exhibits do not support their theory, as none of these specifics were given.
In its decision, the trial court chose not to adopt either Russell's or Duvall's calculations of Mr. Marcus' 1996 income. Instead, the trial court allowed for a partial add back of the depreciation expenses of 30%, thus permitting a 70% deduction of the depreciation expenses. The trial court reasoned that this "30% figure is based upon the difference in the true economic life of an asset and the Internal Revenue Service 7-year tables. The 30% figure is the amount which is necessary to be added back in under accepted accounting principles to normalize the actual net income of the Defendant from his business."
In reaching this conclusion, the magistrate and the trial court made no findings of fact regarding what items were being depreciated, if those items were "ordinary and necessary" under R.C. § 3113.215(A)(4), and if the items were replacement items. Also, neither the magistrate nor the trial court even addressed the actual cash expenditures for WOP and Fairborn Pizza, thus no findings were made that any of the cash expenditures were "ordinary and necessary" expenses under the statute. In reviewing the record, these questions remain unanswered.
In this case, we cannot determine if the trial court did follow R.C. § 3113.215(A)(4). The trial court provided no findings of fact regarding Mr. Marcus' depreciation expenses and actual cash expenditures. Because the trial court's decision is ambiguous, we conclude that we must remand these three assignments of error and direct the trial court to make further findings of fact. Additionally, we believe that it would be inequitable, and not in Lauren's best interest, to calculate child support using the actual guideline amount while allowing Mr. Marcus deductions for depreciation and actual cash expenditures as Mr. Marcus argues. Upon remand, if the trial court determines that a large portion of the cash expenditures can be deducted, we would agree that this would be an appropriate case for a deviation from the guidelines consistent withKamm, supra.
Mr. Marcus' first, second and fourth assignments of error are hereby remanded to the trial court for further factual determination.
 III. The trial court abused its discretion when it included $8,000.00 of "corp benefits" in appellant's income for child support purposes without any evidence that appellant received any additional corporate benefits.
In his third assignment of error, Mr. Marcus claims that the trial court abused its discretion in adopting Russell's imputation of an additional $8,000 in income for corporate benefits for the purposes of calculating his child support obligation. Mr. Marcus contends that there was no evidence supporting the imputation of these benefits, and that Russell based the amount on his "gut feeling." We agree.
At the hearing, Russell testified that he added back $8,000.00 in corporate benefits to Mr. Marcus' 1996 income for child support computation. Russell's relevant testimony is as follows:
 Q. Okay. Now, you have an item, line item down here for corporate benefits, and for each year on the tax return of Eric he's indicated a zero and you have added back $8,000?
A. That is correct.
Q. What is your basis for that?
 A. Again, I made inquiries and I got no response to the extent of what those corporate benefits were, except Mr. Duvall indicated what benefits were added back that were included in his W-2, which, I believe, was some personal car usage, et cetera.
 And so, again, this $8,000 was on a judgmental basis based on my experience in dealing with closely held companies, multiple, two outlets, that type of thing, as a conservative but reasonable number for the personal benefits that he may enjoy that were not taxed to him.
Q. So it's an assumption you made without any documentation?
 A. That's correct. It was partially made on the basis that I could not get, there was nothing indicated to me as being provided.
(Tr. 28) Furthermore, Russell testified that he was a certified fraud examiner, and that he did not do an independent audit of Mr. Marcus' information, but instead based his recommendations on the tax returns and financial statements prepared by Duvall. Russell stated that during his analysis of Mr. Marcus' information, nothing had been brought to his attention that had made him feel as though he was being "misled."
Duvall testified that his firm had been preparing Mr. Marcus' tax returns for many years, and that he was not aware of any corporate benefits enjoyed by Mr. Marcus which would not have been included as personal income on Mr. Marcus' W-2's. Duvall stated that the returns did take into account Mr. Marcus' company car, the rally car and applicable expenses, Bengals tickets, seats at the Victoria Theater, and seats at the Indianapolis 500. Additionally, Duvall and Mr. Marcus testified that the IRS had performed a lifestyle audit on Mr. Marcus in 1993-1994, and that the above-mentioned benefits were disclosed during that audit. The IRS had determined that these benefits were for business purposes and did not make any further adjustments to Mr. Marcus' tax liability based on those benefits.
It may be arguable that Mr. Marcus enjoys corporate benefits other than those contained on his W-2's, however neither Russell nor Ms. Marcus produced evidence of any additional benefits which were not accounted for on Mr. Marcus' W-2's. Additionally, Russell mentioned that the imputed $8,000 was based on his experience in dealing with closely held corporations, but he neither produced testimony of corporate benefits of similarly-situated owners of similar closely held corporations nor produced any specific data based on his experience.
Because the record is void of evidence supporting the existence of any corporate benefits taken by Mr. Marcus, in addition to those contained on his W-2's, we find that the trial court did abuse its discretion in arbitrarily imputing $8,000 worth of corporate benefits to Mr. Marcus. We therefore sustain Mr. Marcus' third assignment of error, and remand the issue to the trial court for recalculation of child support without this imputation made to Mr. Marcus' income.
 V. The trial court abused its discretion when it failed to consider the minor childrens' (sic) income in calculating child support.
Mr. Marcus claims that the trial court abused its discretion by not considering Lauren's financial resources in computing his 1996 income for child support purposes. At the time of trial, Lauren had a custodial account of $221,600, plus an additional one-quarter interest in the Brandt Pizza Store, valued at approximately $100,000. Additionally, her custodial account generated approximately $23,000 to 25,000 per year in interest income. In his reasoning, Mr. Marcus relies on Frost v. Frost (1992),84 Ohio App.3d 699, and the language as amended in R.C.3113.215(B)(3)(f), and claims that the trial court was required to consider Lauren's income from her custodial account in calculating child support.
In her response, Ms. Marcus argues that the statutory language upon which the Frost court relied has been repealed, and pursuant to R.C. § 3113.215(B)(3)(f), the financial resources and earning ability of the child is now one factor for the court to consider in deviating from the child support guidelines. Ms. Marcus also argues that it would be inequitable for the court to consider Lauren's account for child support purposes, because neither Lauren nor Ms. Marcus have had access to this account.
In Frost, supra, each child had over $100,000 in a savings account established for educational purposes. Id. at 710. At the time of the decision, R.C. § 3109.05(A)(1)(a) stated that assets such as those were to be considered in the calculation of child support. Id. The court thus determined that based on the language of R.C. § 3109.05
at that time, the trial court was required to consider the financial resources and the earning ability of the child in computing child support, thus the trial court abused its discretion by not considering the interest income earned on each child's accumulated assets. Id.
However, since the decision in Frost in 1992, R.C. § 3109.05
has been amended. It is no longer mandatory for the trial court to consider the minor child's financial resources and earning ability in the calculation of child support. Instead, under R.C. § 3113.215(B)(3)(f), the financial resources of the child and the child's earning ability are reasons a trial court may deviate from the child support guidelines.
Under R.C. § 3113.215(B)(3)(f), we find that it was an abuse of discretion for the trial court to fail to consider a deviation based on the interest income earned on the childrens' custodial accounts. The accounts are significant financial resources which should have been considered as reasons for deviation from the child support guidelines. However, in concluding that the trial court must consider whether these accounts are grounds for deviation, we do not imply that the trial court must ultimately decide to deviate from the guidelines based on these accounts.
Additionally, Mr. Marcus contends that it was error for the trial court, in calculating his income for child support purposes, to fail to give him a credit for his payment of the childrens' income taxes on the custodial accounts every year. Absolutely no evidence was produced at trial supporting Mr. Marcus' allegations that he had paid the taxes out of his personal account and not from the annual interest produced from each of the accounts. As such, the trial court did not abuse its discretion by failing to consider the allegations that Mr. Marcus had paid the childrens' income taxes every year.
As such, we sustain the first part of the assignment of error, and remand the case to the trial court to consider a deviation in Mr. Marcus' obligation predicated upon specific findings concerning the best interests of the child and the possible inappropriateness of the guideline amount. R.C. 3113.215(B)(1)(a) and (b). However, we overrule the second part of this assignment of error.
 VI. The trial court abused its discretion in failing to deviate from the child support guidelines to prevent an inequitable and disparate treatment of appellant's children for purposes of allocating child support dollars.
Mr. Marcus contends that the trial court abused its discretion by not deviating from the child support guidelines because of his parental responsibilities for his two children from his current marriage. Mr. Marcus claims that under the trial court's calculation of support, Lauren and Andrea are each entitled to $38,707 in support from him, while his children from his current marriage are only entitled to an amount of support equivalent to the federal personal exemption rate of $2,650 each per year. As such, he claims that this violates the equal protection rights of the children from the second marriage, because the court is discriminating between children of divorced parents and children of a new family when allocating child support dollars. Additionally, Mr. Marcus claims that there is even disparate treatment between Lauren and Andrea, because Lauren does not have to "compete" with any other siblings for her allocated $38,707 in annual child support, while Andrea must "compete" with her siblings for a total of $44,007 (which includes her $38,707 plus the $2,650 for each of the children from the current marriage).
We do not find that the trial court abused its discretion in failing to deviate from the guideline amount based on this claim, and we cannot accept Mr. Marcus' equal protection argument as valid. To begin, the trial court strictly adhered to the guidelines in allowing a deduction from gross income for support of the minor children living with Mr. Marcus. In computing child support, the trial court was obligated to give credit to him for the minor children who were born to him and his current wife. Under that section, the trial court was mandated to deduct an amount from Mr. Marcus' income equal to the "number of minor children times the federal income tax exemption for such children less child support received for them for the year, notexceeding the federal income tax exemption." R.C. § 3113.215(B)(5)(c). (Emphasis added.) In this case, Mr. Marcus has one biological child from his current marriage, and a second child whom he adopted. Thus, the trial court did properly deduct $2,650 per child for the two children he had residing with him from his current marriage.
We also do not find any equal protection violation in the statute itself. The issue of constitutionality of the child support guidelines has been addressed and rejected by other Ohio courts. State ex rel. Scioto Cty. ChildSupport Enforcement Agency v. Gardner (1996), 113 Ohio App.3d 46;Lynch v. Lynch, (Dec. 5, 1989), Franklin App. No. 88AP-699, unreported;Malinowski v. Malinowski (April 10, 1989), Stark App. No. CA-7601, unreported, and Surman v. Surman (June 22, 1989), Mahoning App. No. 88CA85, unreported. We are in agreement with these courts which found no usurpation of legislative authority by the enactment of the guidelines. As the court in Lynch, supra, noted, "the guidelines are merely a starting point for the courts and, as such, they are not unconstitutional."
Moreover, in Haskins v. Long (July 25, 1989), Ross App. No. 1464, unreported, the court ruled that the deduction at the federal income tax rate for appellant's minor child residing with him was constitutional and did not violate any equal protection rights. The court reasoned:
 The court below did not rule the child living with appellant may only receive the amount of the deduction as support. Appellant may support the child with as much as he is willing or able. Rather than limit the amount a parent can spend on a child living in his home, the child support rules in question provide a method for computing support for children not
living with the parent.
 Id. Similarly, in this case the trial court applied the proper deduction amount in calculating Mr. Marcus' gross income for child support purposes. The trial court did not in any way limit Mr. Marcus' support of the minor children living with him to $2,650 per year per child. As theHaskins court noted, Mr. Marcus can support his children to any extent he feels proper. This is not a denial or limitation of support to the children from Mr. Marcus' current marriage, or to Andrea, but instead it is a way of calculating his child support obligation to Lauren, who is not residing with him.
Mr. Marcus' sixth assignment of error is overruled.
 VII. The trial court abused its discretion when it included additional WOP income that is restricted by the parties' final judgment and decree of divorce in appellant's income for child support purposes.
In his final assignment of error, Mr. Marcus claims that because the parties agreed in the divorce decree that his income would not exceed $130,000, the trial court abused its discretion by attributing to him an income greater than that amount.
The portion of the decree at issue reads as follows:
 22. The defendant shall pay the plaintiff a lump sum property settlement of $800,000.00 payable as follows with interest at 4% per annum from the date of the filing of this final judgement and decree of divorce:
 a. The defendant will pay the plaintiff an amount each year on or before April 1st beginning April 1, 1994, equal to 17% of the total after tax earnings of Western Ohio Pizza, Inc. based upon the company's financial statements at the end of each calendar year as prepared by the company's accountants. Payment shall be applied first to interest and then to principal.
* * *
 c. The defendant shall have the right to prepay said obligation without penalty.
* * *
 Until said property settlement is paid in full, the defendant's annual wages from Western Ohio Pizza, Inc. shall not exceed $130,000.00 per year beginning in 1993 plus normal cost of living increases as set forth on the Consumer Price Index for all Urban Consumers (CPI-U) — US City Average.
(Final Judgment and Decree of Divorce, Doc. 44, pp. 6-7.)
We fail to grasp Mr. Marcus' argument that this section of the decree prevents the trial court from determining that Mr. Marcus has exceeded $130,000 in income for child support purposes. Again, a subchapter S corporation's earnings are attributable to the sole owner, in all fairness, for child support purposes. I.R.C. § 1366(a)(b)(c); Harter,supra. We do not believe that the trial court abused its discretion by making a determination that Mr. Marcus has access to more than $135,000 of WOP's income per year.
Mr. Marcus would also like this court to feel some degree of sympathy for him, as "he had not even been able to satisfy all of the interest payments due under the terms of the part 22," and he has not paid any principal on the above-mentioned note. This argument ignores the pertinent facts surrounding this situation. The record reflects that section 22, limiting Mr. Marcus' income, was included in the decree to make him comply with the terms of the settlement agreement. He is obligated to pay a minimum of 17% of WOP's earnings towards the agreement, but he is not limited to that amount. However, as WOP has deducted over $500,000 per year in depreciation expenses, and over $500,000 in cash expenditures, WOP has had a negative balance for the several years preceding the hearing. As such, Mr. Marcus has not been "able to satisfy" the terms of his obligation, because 17% of a negative number relieves him of his annual obligation, at least temporarily. Under these circumstances, we are not sympathetic to his position.
As such, Mr. Marcus' seventh assignment of error is overruled.
The judgment of the trial court is reversed in part and remanded for further proceedings consistent with this opinion.
GRADY, P.J. and WOLFF, J., concur.
Copies mailed to:
Paul W. Barrett
L. Anthony Lush
Hon. Judson L. Shattuck, Jr.